THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROSA PEREZ and ELVIS PEREZ, as :
Individuals and ROSA PEREZ o/b/o :
WILLIAM PEREZ and LARRY :
PEREZ, minors :
                                  :   4:07-cv-2291
           **Plaintiffs** :   (JUDGE MARIANI)
   v. :
                                    :
BOROUGH OF BERWICK, et al. :
                                    :
          **Defendants** :

## MEMORANDUM OPINION

Plaintiffs' civil rights action arises out of the 4:00 a.m. entry into the home of Rosa Perez

("Rosa") and her children, Jose Perez (a non-party) ("Jose"), Elvis Perez ("Elvis"), William

Perez ("William"), and Larry Perez ("Larry") by members of the Berwick Police Department,

Immigration and Customs Enforcement, and the Columbia County Adult Probation and Parole

Department, in an attempt to execute several bench, summary, and immigration warrants. For

the reasons set-forth below, the Court finds the early-morning entry an unreasonable affront to

the Fourth Amendment; however, all Defendants are entitled to qualified immunity given the

particular circumstances surrounding the incident and the absence of clear and controlling

precedent in this circuit. Accordingly, Defendants' motions for summary judgment will be

granted, and Plaintiffs' motion for summary judgment will be denied.

In deciding this case, the Court is sensitive to several important issues concerning the

right of citizens to feel secure in their homes and be free from unreasonable government

1

intrusion, the responsibilities of law enforcement officers to safely and diligently carry-out their duties, the importance of enforcing a court's bench and arrest warrants, and the deference granted to judges who rule on particular aspects of a case that is subsequently transferred to another judge. Balancing these interests presents the Court with an opportunity to clarify a complex and fluid area of the law, and to focus attention on core principles of criminal procedure and constitutional rights.

## BACKGROUND

In the pre-dawn hours of March 21, 2007, several police officers from the Borough of Berwick ("Berwick Police"), along with three agents from the United State Bureau of Immigration and Customs Enforcement ("ICE"), and a probation officer from the Columbia County Adult Probation and Parole Department ("Probation Department") organized as a team to serve various warrants issued against Elvis, Erik Mayorga ("Erik"), Luis Mayorga ("Luis"), and Yvelyn Yaneth Ordonez ("Ordonez"). (See Pls.' Statement of Mat. Facts ¶¶ 1-4.) The officers had reason to believe that all four subjects of the warrants resided at 1207 4th Avenue, Berwick, Pennsylvania ("Perez Residence"). (See Defs.' Statement of Mat. Facts ¶¶ 1, 2, 4, 8.) After a briefing at the Berwick Police Department, the law enforcement parties travelled to the Perez Residence to execute the warrants. (See Pls.' Statement of Mat. Facts ¶¶ 1-3.)

The Berwick Police officers involved included Heather Rood-Comstock ("Rood"), Troy Maneval ("Maneval"), Roger Bodwalk ("Bodwalk"), Steve Levan ("Levan"), Greg Martin ("Martin"), and Christopher Wilson ("Wilson"). Tiffany Panetta ("Panetta") represented the

2

Probation Department, and Patrick Cawley ("Cawley"), David Christiano ("Christiano"), and Kimberly Mullings ("Mullings") represented ICE.  (See Pls.' Statement of Mat. Facts ¶¶ 4-13.)

According to Plaintiffs, Ordonez, Luis, and Erik never lived at the Perez Residence. (See Pls. Statement of Mat. Facts ¶ 15.)  Furthermore, as detailed in Plaintiffs' Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment, Defendants possessed the following warrants: (1) a summary arrest warrant for Ordonez for harassment by physical contact; (2) a summary warrant for Luis for a parking violation; (3) a bench warrant for Erik for failure to adhere to the terms of an ARD program imposed for driving under the influence, careless driving, failure to stop at a stop-sign, and driving without lights to avoid identification and arrest, and a subsequent failure to attend a Gagnon II revocation hearing; (4) two bench warrants for Elvis relating to summary traffic incidents; and (5) an administrative immigration warrant for Erik.  (See id. at ¶ 14.)  Ordonez, Luis, and Erik were not present at the Perez Residence at the time of the execution of the warrant (see id. at ¶ 16), Defendants did not possess any search warrants, and none of the warrants in Defendants' possession were explicitly authorized for nighttime service (see id. at ¶ 17).

Plaintiffs assert that Defendants arrived at the Perez Residence between 5:00 a.m. and 5:30 a.m. (see Pls.' Statement of Mat. Facts ¶ 20), although Defendants, in an attempt to grant every factual inference in favor of Plaintiffs, stipulate that the entry occurred at 4:00 a.m. (see Defs.' Statement of Mat. Facts ¶ 55).  Accordingly, the Court will treat 4:00 a.m. as the operative time at which the entry began.

3

Prior to entering the Perez Residence, Plaintiffs assert that nine officers lined-up, single file, at the front door, while three other officers went to the back of the home. (See Pls. Statement of Mat. Facts ¶ 21.) Plaintiffs further maintain that the officers were armed with automatic weapons and wore face masks. (See Second Am. Compl. ¶¶ 28-29.) Defendants insist that no officer or agent possessed an automatic weapon, and no member of the law enforcement team wore a mask.

Plaintiffs aver that Defendants "pounded" on the front door of the Perez Residence, and Defendant Panetta announced, "probation open the door." (See Pls.' Statement of Mat. Facts ¶¶ 24-25.) At that point Rosa, who slept in the living room near the front door so that she could assist her wheelchair bound son Larry, opened the door. (See id. at ¶ 29.) Panetta was the first to greet Rosa, but Panetta is not conversant in Spanish. (See id. at ¶¶ 31-32.) Rosa speaks limited English. (See id.) Plaintiffs claim that Rosa opened the door "about halfway", but was pushed aside by entering officers while she had a brief conversation with Panetta. (See id. at ¶ 41.) Panetta told Rosa "my name's Tiffany Panetta from adult probation. We have a warrant here to serve to Erik Mayorga." (See id. at ¶ 35.) Panetta testified that Rosa answered by asking either "who or what?" (See id. at ¶ 36.) Allegedly, once again, Panetta repeated her name and purpose. (See id. at ¶ 38.) Plaintiffs assert that Rosa was the only member of the Perez Residence to communicate with Defendants prior to the entry. (See id. at ¶ 37.)

At this time, Rood, Maneval, Martin, Wilson, Mullings, Christiano, and Leven entered the Perez Residence. (See id. at ¶ 40.) Panetta followed. (See id.) Ms. Perez did not say "no" or

4

"get away" to the officers or agents, nor did she "slam the door." (See id. at ¶¶ 43-44.) No law enforcement officer, nor Panetta, asked for consent to enter the Perez Residence, nor was it ever given. (See id. at ¶¶ 50-51.) Once the officers and agents were inside the home, Rosa asked Panetta why the officers and agents were there. (See id. at ¶47.) This encounter lasted about "five seconds." (See id. at ¶ 48.) Upon entry, the officers and agents searched the home for Erik. (See id. at 49.)

Plaintiffs argue that it is the "policy and practice of Borough of Berwick to serve bench warrants 'any time, day or night.'" (See id. at ¶ 55.) Specifically, Plaintiffs assert, it is the policy and practice of Berwick Police to allow officers to serve bench warrants between 10 p.m. and 6 a.m. "if it is convenient for the officers." (See id. at ¶ 56.) Plaintiffs also maintain that it is the policy and practice of "Columbia County" to serve bench warrants at any time day or night, and to assume consent to enter a private home when the resident does not object or physically resist. (See id. at ¶ 57.) Defendants arrested Elvis on two bench warrants issued for traffic violations, but the underlying charges were later dismissed. (See id. at ¶¶ 60-61.) None of the other warrants were served.

Defendants argue they had reasonable belief that Ordonez, Luis, and Erik resided at the Perez Residence. Not only was the Perez Residence widely known to be used as a "boarding house," but Ordonez, Luis, and Erik each used the 1207 4th Avenue, Berwick, Pennsylvania, address. (See Defs.' Statement of Mat. Facts ¶¶ 1, 8.) For example, on October 4, 2005, Erik informed the Columbia County Clerk of Court that 1207 4th Avenue was his address. (See id. at ¶ 17.) Again, on February 1, 2007, Erik used that address at his intake with the Probation

Department. (See id. at ¶ 18.) Additionally, after Erik was unable to procure a social security number following a DUI conviction, his probation officer—Panetta—contacted ICE and confirmed that Erik was an illegal alien. (See id. at ¶ 20.) The Probation Department has in its files a "Mail-In Form," allegedly sent by Erik, dated April 29, 2006, listing a current address as 1003 E. 3d Street, Berwick, Pennsylvania. (See id. at ¶ 21.) Although the secretarial staff at the Probation  Department was required to input the new address, it is not contained in the computer database; however, even if the new address had been properly entered, the database would still contain the old address because offenders "move from place to place" and may "tell you that they have move, and they really did not" or "there's common houses where a lot of offenders will be." (See id. at ¶¶ 22-24.) When Erik failed to meet the conditions of his ARD program, Panetta petitioned to revoke his "parole," and the Honorable Thomas A. James, Jr., issued a bench warrant for his arrest following Erik's failure to attend a "Gagnon II" revocation hearing on January 26, 2007. (See id. at ¶ 25.) After the issuance of the bench warrant, the Berwick Police were notified. (See id. at ¶ 29.)

After Rood received a copy of the arrest warrant for Erik and the intake paperwork indicated that he was an illegal alien, Rood contacted ICE, which had plans to execute other warrants in the Berwick area. (See id. at ¶¶ 30-31.) Rood also spoke with Panetta to verify the existence of the bench warrant, and to inform Panetta about the ICE warrant. (See id. at ¶ 32.) Rood cautioned Panetta not to serve the warrant alone, as the Perez Residence was a suspected center of gang activity with a long history of police intervention. (See id. at ¶ 33.)

For safety reasons, it was decided that the officers should arrange a group to serve the warrants. (See id.)

Using information from a parking citation issued to Luis listing the Perez Residence as an address, and after conducting research in the national criminal database, JNET, Rood discovered that Luis was a member of the gang known as Salvadorians With Pride. (See id. at ¶ 34.) Panetta drafted a memo concerning her contacts with Erik, and sent it to Rood so that she could forward it to ICE. (See id. at ¶ 35.) Special Agent Cawley of the violent alien gang squad of ICE received the memo, which listed the Perez Residence as Erik's address. (See id. at ¶ 36.) Cawley drafted a special Notice to Appear for Erik, charging him with violating the Immigration and Nationality Act, and issued a warrant for his arrest. (See id. at ¶ 39.) Cawley also obtained an Administrative Warrant to take Erik into custody and a Notice of Detention to detain Erik once he was arrested. (See id. at ¶ 41.) In addition, Cawley received information that Rosa's oldest son, Jose, was involved with both the Bloods and MS-13 gangs in New York. (See id. at ¶ 43.)

In the two days leading to the March 21, 2007 service of the warrants, Berwick Police conducted surveillance of the Perez Residence, and determined that there was much activity around the home at approximately 4:45 a.m. (See id. at ¶ 44.) On the morning of the execution of the warrants, ICE agents Cawley, Mullings, and Christiano, accompanied by Philadelphia police officer Luis Arroyo ("Arroyo"), who had been assigned to the ICE task force, drove to Berwick to meet with Panetta and the Berwick Police officers who would be involved in the entry. (See id. at ¶ 48.) A plan was established.

7

Defendants further maintain that all officers and agents wore clothes identifying themselves as law enforcement, and that none of the Defendants wore face masks. (See id. at ¶¶ 49-50.) Defendants also aver that when they entered the Perez Residents, "they identified themselves and stated who they were looking for." (See id. at ¶ 62.) Officers and agents saw mattresses on the floor, and noticed "one male (William Perez) on an air mattress with an ankle bracelet because he was under house arrest, and one male (Elvis Perez) on the staircase." (See id. at ¶ 63.) William told the officers: "You guys are so fucking stupid. Luis is in jail" in New York. (See id. at ¶ 64.) Immediately prior to the entry, Elvis viewed the approaching officers from an upstairs bedroom window. (See Elvis Perez Dep. at 39 [ECF Doc. 130].) When he saw them enter the house, he immediately asked Defendants to produce their "search warrants." (See id.) The officers performed a protective sweep of the Perez Residence, and secured Rosa, William, and Larry in the living room. (See Defs.' Statement of Mat. Facts ¶ 65.)

Berwick officers and Cawley asked Elvis for his identification, as it is ICE custom to ask everyone in the residence for such papers when executing an administrative warrant. (See id. at ¶¶ 68-69.) It was Cawley's understanding that a person identifying himself as Elvis had used different social security numbers on various paperwork, so Cawley could not be sure of Elvis's true identity. (See id. at ¶ 70.) Elvis told the officers that his identification was in his bedroom and that they could retrieve it. (See id. at ¶ 71; Elvis Perez Dep. at 44-45.) Mullings stood at the front-door with Rosa, Larry, and William. (See Defs.' Statement of Mat. Facts ¶ 72.) After Elvis's citizenship papers were located, the ICE agents took no further action and left the residence. (See id. at ¶ 73.) ICE was never able to locate Erik. (See id. at ¶ 74.)

According to Defendants, it was the understanding of the officers and agents that an arrest warrant could be served at any time. (See id. at ¶¶ 77-81, 83-84, 86-87.) In fact, Cawley "believed that the execution of an arrest warrant before 6:00 a.m. was prudent because the subject of the warrant may be gone before 6:00 a.m.—and he believed that Erik Mayorga would be gone before 6:00 a.m." (See id. at ¶ 78.) In fact, Elvis admits that he gets up for work around 5:30 a.m., and is often on his way to work by 6:20 a.m. (See Elivis Perez Dep. ¶ 38.) The ICE agents relied upon the local officials' expertise as to the propriety of serving a warrant in the manner and at the time at which it was executed. (See Defs.' Statement of Mat. Facts ¶ 79.) No officer or agent believed that the service of a warrant at night violated any law, and it is the "policy and understanding of Berwick Police that Pennsylvania rules allow for bench and arrest warrants to be served at any time day or night." (See id. at ¶ 83.) This was also Panetta's understanding of the law, and the understanding of Donald Coleman, Chief Adult Probation and Parole Officer for Columbia County, who "indicated that it was the department's policy to serve bench warrants '24/7.'" (See id. at ¶¶ 116-117.)

## JURISDICTION AND VENUE

Jurisdiction is proper in this matter pursuant to 28 U.S.C. § 1331, as Plaintiffs' Complaint raises several federal questions, including those arising under the Constitution of the United States. Moreover, venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred within the Middle District of Pennsylvania.

## STANDARD

When deciding a summary judgment motion pursuant to FED. R. CIV. P. 56, the Court

must evaluate whether there are genuine issues of material fact and determine whether the

moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c). "A motion

for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but

will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle &

Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "Material" facts are those which proof

of its existence or non-existence might affect the outcome of the litigation. See Anderson, 477

U.S. at 248. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." Id.

While engaging in this analysis, the Court must consider all facts in the light most

favorable to the non-moving party. "After making all reasonable inferences in the nonmoving

party's favor, there is a genuine issue of material fact if a reasonable jury could find for the

nonmoving party." Pignataro v. Port Auth. Of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010)

(citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). Although the moving

party bears the initial burden of showing the absence of a genuine issue of material fact,

meeting this obligation shifts the burden to the non-moving party who must "set forth specific

facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

## DISCUSSION

Plaintiffs argue that the nighttime entry into their home by several law enforcement agencies for the purpose of executing summary, bench, and immigration warrants was unreasonable under the Fourth Amendment, and hence, constitutionally impermissible. Plaintiffs further maintain that the law enforcement officials who served the warrants are not entitled to qualified immunity for their actions because Defendants acted in utter disregard of Plaintiffs' constitutional rights.

At the outset it must be noted that the Court is sensitive to the late Judge James F. McClure's April 28, 2009 memorandum opinion [ECF No. 41] in which he examined the constitutional propriety of the search at issue in this case. While reaching the same result with regard to the constitutional validity of the execution of the warrants, the Court does not adopt Judge McClure's reasoning, and the Court's present holding seeks to narrow Judge McClure's opinion considerably. Although the law of the case doctrine serves an important function in preserving rulings from earlier in the litigation, it does not act as an absolute bar and the Court may, in its discretion, abrogate a holding from an earlier stage in the same case.

### A. Law of the Case Doctrine

Plaintiffs argue that the law of the case doctrine requires the Court to accept Judge McClure's ruling with regard to the constitutional propriety of the nighttime seizure. Indeed, Plaintiffs spend considerable energy discussing the strong preference that the present Court not reconsider the findings of a predecessor judge who is now deceased. Plaintiffs' arguments lack merit, as the law of the case doctrine "directs a court's discretion, it does not limit the

tribunal's power." Arizona v. California, 460 U.S. 605, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983).

An examination of the law of the case doctrine as it is applied in the Third Circuit reveals that district courts should exercise caution when reopening issues settled in earlier stages of the same litigation; however, some circumstances warrant, and some require, reconsideration. In particular, the Third Circuit instructs that "a successor judge may entertain a timely motion to reconsider the conclusion of an unavailable predecessor, because otherwise the right to move for reconsideration would be effectively denied." See Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 169 (3d Cir. 1982). Additionally, if the earlier decision is clearly erroneous, it is the duty of the district court to ensure that the previous holding does not work a manifest injustice. See Arizona, 103 S.Ct. at 1391 n. 8. "The doctrine is not a "barrier to correction of judicial error.'" Shultz v. Onan Corp., 737 F.2d 339, 345 (3d Cir. 1984)(quoting Loumar, Inc. v. Smith, 698 F.2d 759, 762 (5th Cir. 1983)); see also Agostini v. Felton, 521 U.S. 203, 206, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997); Rohrbach v. AT&T Nassau Metals Corp., 915 F. Supp. 2d 712, 716 (M.D.Pa. 1996)(Vanaskie, J.)(reversing predecessor judge's opinion where predecessor was unavailable and decision was clearly erroneous).

In the present matter, Judge McClure's decision was predicated upon two cases that are inapplicable to the constitutional analysis required here, as well upon an erroneous construction of the Pennsylvania Rules of Criminal Procedure. For the reasons articulated below, the Court finds Judge McClure's ruling clearly erroneous and overly broad, and now

seeks to narrow his opinion to prevent an unnecessarily sweeping ruling on the constitutionality of nighttime execution of bench and arrest warrants.

### B. The Prior Ruling of this Court By Judge McClure Holding Unconstitutional the Warrants in this Case Because They Were Executed at 4:00 a.m.

Judge McClure's reliance on United States ex. rel. Boyance v. Meyers, 398 F.2d 896 (3d Cir. 1968), and O'Rourke v. The City of Norman, 875 F.2d 1465 (10th Cir. 1989), to support his ruling was misplaced. In Boyance, officers requested a search warrant at 1:00 a.m., and the warrant was issued with the caveat "search in the daytime" printed on its face. Boyance, 398 F.2d at 897. At approximately 2:30 a.m., the officers executed the warrant in defiance of the judge's clear order. Id. Judge McClure, while recognizing the Third Circuit's aversion to nighttime searches, did not make any distinction for the material fact that the warrant expressly mandated daytime service, nor did he make the necessary distinction between an arrest or bench warrant and a search warrant.

Reliance upon O'Rourke is similarly flawed because the Tenth Circuit's decision was premised upon an interpretation of an Oklahoma statute, which expressly requires judicial sanction in order to execute an arrest warrant at night. See O'Rourke, 875 F.2d at 1471. Pennsylvania, like many other states, does not have such a statutory mandate. Consequently, O'Rourke can play no part in the present analysis.

Pennsylvania law, much like the Federal Rules of Criminal Procedure, draws a distinction between arrest/bench warrants and search warrants. Pennsylvania Rule of Criminal Procedure 150 governs the issuance and execution of bench warrants, and does not place any

13

limitation on the time at which officers can take a suspect into custody. Pennsylvania Rule of

Criminal Procedure 515 similarly governs the issuance and execution of arrest warrants, and

like Rule 150, does not prohibit the execution of a warrant at night. In fact, Pennsylvania Rule

of Criminal Procedure 431 institutes specific procedures for bench and arrest warrants served

outside of the hours of 6:00 a.m. and 10 p.m. See PA. R. CRIM. P. 431(A)(1) and (2).

Conversely, however, Pennsylvania Rule of Criminal Procedure 203(f) requires that search

warrants conducted at night be authorized only after a finding of "reasonable cause".

Moreover, under the Statutory Construction Act, "when the words of a statute are clear

and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing

its spirit." 1 Pa.C.S. § 1921(c). In addition, "[s]tatutes or parts of statutes are *in pari materia*

when they relate to the same persons or things or to the same class of persons or things." 1

Pa.C.S. § 1932(a). Thus, the Court must refrain from reading words into a statute that the

legislature has omitted. The Court does not, and should not, presume that the legislature

intended to treat arrest, bench, and search warrants similarly when the text of the Pennsylvania

Rules of Criminal Procedure indicate otherwise. Furthermore, an examination of Rules

431(A)(1) and (2) buttresses the argument that Pennsylvania law permits the service of bench

and arrest warrants at any time. Judge McClure's earlier opinion goes too far in that the Court

unnecessarily instituted a bright-line rule preventing the execution of arrest and bench warrants

that do not explicitly authorize nighttime service. This is a misconstruction of Pennsylvania law,

and no federal rule or court holding requires this conclusion. Courts must consider the

individual facts underlying a particular case in order to make a determination as to the

reasonableness of a nighttime entry.  A bright-line rule as to the nighttime execution of bench

and arrest warrants prevents the case-by-case analysis for reasonableness that the Fourth

Amendment requires.  On this point, Judge McClure's analysis of the Pennsylvania Rules of

Criminal Procedure was clearly erroneous and is now revised by the Court.[1]

### C. Constitutional Propriety of the Pre-Dawn Entry

In the present matter, Plaintiffs' home was entered by law enforcement officials seeking

to execute summary arrest, bench, and immigration warrants.  These warrants, excepting the

immigration warrant, were all issued for misdemeanor and summary offenses including: (1)

Elvis for two traffic citations; (2) Ordonez for harassment by physical contact; (3) Erik for failure

to adhere to the terms of an ARD program, and subsequent failure to attend a Gagnon II

revocation hearing; and (4) Luis for a parking violation.[2]  None of the alleged crimes underlying

the warrants involved violent activity, and none of the warrants pertained to felonies.[3]  The

Court is troubled with the notion of law enforcement officers effectuating a pre-dawn raid to

serve non-felony warrants, absent some showing of reasonable cause.

---

[1] For the reasons stated above, Judge McClure's decision in denying Panetta's motion to dismiss on basis of qualified immunity is also clearly erroneous.

[2] Under Pennsylvania law, the following penalties apply for violations of the summary and misdemeanor offenses described herein: (1) driving without a valid operator's license, $200 fine (see 75 Pa. Cons. St. § 1501(d)); (2) general parking summons, $50 fine (see 75 Pa. Cons. St. § 3353(e)); (3) driving the wrong-way on a one-way street, $25 fine (see 75 Pa. Cons. Stat. § 6502(a)); (4) harassment by physical contact, $300 fine and no more than 90 days imprisonment (see 18 Pa. Cons. Stat. §§ 1101(7) & 1105); (5) failure to adhere to the terms of an ARD program, prosecutor may proceed with charging a suspect with the underlying offense (see Pa. R. Crim. Pro. § 318); (6) driving a motor vehicle under the influence of alcohol, no more than six months imprisonment and a fine not to exceed $300 (see 75 Pa. Cons. Stat. §§ 3803, 3304); (7) careless driving, maximum $250 fine (see 75 Pa. Cons. Stat. § 3714; (8) failure to stop at a stop sign, $25 fine (see 75 Pa. Cons. Stat. § 6502(a); and (9) driving without lights to avoid identification or arrest, $200 fine (see 75 Pa. Cons. Stat. § 3734).

[3] The Court also notes the limited ability of law enforcement to enter a private residence solely upon the basis of an administrative immigration warrant.  In fact, it is established precedent that administrative warrants do not give law enforcement the right to enter a residence without consent, absent an accompanying search or arrest warrant.  See Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 534 (1963) (administrative warrants do not, in themselves, authorize an entry without consent or exigent circumstances).

For example, Defendants have argued that the Perez Residence harbored potentially violent gang members, served as a boarding house, and that the inhabitants often stirred in the early-morning hours in order to leave the home before 6:30 a.m. While these factors certainly point to a more reasonable explanation for an early morning entry, especially given the likelihood that the targets of the warrants would be present in the home at that hour, the Court remains unconvinced that the overall circumstances necessitated a pre-dawn entry.

The Court also considers the intrinsic differences between search and arrest warrants. Search warrants are issued to permit law enforcement officers the ability to gather evidence that will serve as a basis to secure an indictment against a citizen for an alleged commission of a crime. The presumption of innocence compels courts to guard the citizenry against aggressive, unreasonable tactics, including nighttime searches without adequate cause. On the other hand, arrest and bench warrants serve a substantially different purpose. In effect, both are issued to capture fugitives fleeing justice, detain convicts who have failed to appear for sentencing, and secure persons who refuse to pay various fines and penalties. It is a method to enforce a court's jurisdiction, power, and credibility.

"[A]n arrest warrant founded on probable cause carries with it the limited authority to enter a dwelling in which the suspect lives and when there is reason to believe the suspect is within." Payton v. New York, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In the present matter, the Court must address whether municipal, state, and federal officers exceeded this limited authority, implicit in an arrest warrant, when they entered Plaintiffs' home at 4:00 a.m., absent exigent circumstances, to serve various misdemeanor and summary warrants.

The factual circumstances underlying Fourth Amendment cases are so varied that, "no template is likely to produce sounder results than examining the totality of circumstances in a given case; it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones." United States v. Banks, 540 U.S. 31, 35, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003) (citing Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) ("[W]e have consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry"). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). "In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. at 598-599.

In the present matter, the Court has considered (1) the time of the service of the warrants, (2) the fact that an arrest was made (Elvis for traffic citations, see Pls. Statement of Mat. Facts ¶ 60), (3) the existence of any exigent circumstances, including the nature of the crimes alleged, public safety, and flight concerns, and (4) the absence of a finding by a neutral magistrate that a nighttime execution was reasonable. See Cipes v. Graham, 386 F. Supp. 2d 34, 37 (D. Conn. 2005).

The Supreme Court's long established jurisprudence, reflecting deeply rooted common law principles, indicates a clear preference against the execution of warrants in the middle of

17

the night. Particularly, the Supreme Court recognizes the dangers posed by the nighttime entry

of a private residence by law enforcement. See generally Coolidge v. New Hampshire, 403

U.S. 443, 477, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)(nighttime entry to seize a person is an

"extremely serious intrusion."); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 1514

(1961)(Frankfurter, J., dissenting)("[S]earches of the dwelling house were the special object of

this universal condemnation of official intrusion. Nighttime [warrantless] search was the evil in

its most obnoxious form."), overruled on other grounds, Monell v. Dept. of Social Servs., 436

U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Jones v. United States, 357 U.S. 493, 78 S.Ct.

1253, 2 L.Ed.2d 1514 (1958)("It is difficult to imagine a more severe invasion of privacy than

the nighttime intrusion into a private home."). Although these cases concern warrantless

searches and seizures, and not an arrest pursuant to a warrant issued by a neutral magistrate,

the Supreme Court's cautious approach to the privacy interests accorded to citizens at night,

and within their homes, is apparent. Even in the context of an arrest warrant, the

circumstances surrounding a nighttime entry deserve careful consideration. Guidance from this

Circuit, as well as other federal courts, however, is limited.

    The District of Connecticut, in Cipes, supra, found a nighttime entry constitutionally

impermissible on facts and in circumstances almost identical to those presented here. In that

case, the Court found the execution of a misdemeanor arrest warrant at the arrestee's home in

the middle of the night violated the Fourth Amendment where there were no exigent

circumstances justifying the nighttime execution of the warrant. The Court stated:

    The underlying misdemeanors for which the arrest warrant had been

issued do not on their face provide officers with particular justification to enter into the Plaintiff's home late at night. The warrant applicant recites only that the Plaintiff failed to appear for court proceedings in the second degree criminal mischief case, and bail was set at the low amount of $500.00.

Cipes, 386 F. Supp. 2d at 41.

The Court further observed that the plaintiff's complaint alleged that the officers knew

that Cipes could be found "with ease at any time" in his mother's home, where he had resided

for a number of years, "obviating the need for officers to execute a nighttime misdemeanor

arrest when he could have been found as well in the residence during early morning or daytime

hours." Id.

Accordingly, the Court concluded:

Viewed in the light most favorable to the Plaintiff, no exigent circumstances existed for the execution of the warrant in the middle of the night. . . . Because Plaintiff's misdemeanor arrest could have been effected equally during the daylight hours, because there was no public safety or absconding risk, the heightened privacy interests of an individual at home outweigh the presumptive reasonableness of the arrest conferred by the warrant, rendering the seizure unreasonable under the Fourth Amendment.

Id.

In this case, as noted infra at page 3, the warrants sought to be executed were for

summary offenses for traffic citations, a parking violation, harassment by physical contact, and

for the misdemeanor of driving while intoxicated. These low level offenses do not provide

justification for the execution of bench or arrest warrants at Plaintiff's home at 4:00 a.m.

The Perez Residence was known to law enforcement officials as a suspected boarding

house that harbored alleged gang members, was often the subject of police activity, and a place whose residents often stirred in the pre-dawn hours. Nevertheless, in considering the undisputed material facts in this case, the Court does not find that these factors constitute the exigent circumstances required to justify an entry at 4:00 a.m. The fact that the Plaintiffs were often awake during the early morning hours, left for work before 6:20 a.m., and were the supposed associates of alleged gang members does not require a 4:00 a.m. entry to enforce warrants issues solely for misdemeanor and summary offenses.[4] The prevention of harm to innocent family members outweighs any possible flight risk fueled by misdemeanor or summary offense charges.

Two other district courts have found that nighttime arrests pursuant to a warrant are not impermissible. In Willhauck v. Halpin, the District of Massachusetts confronted the propriety of the nighttime service of a default arrest warrant. 599 F. Supp. 282 (D. Mass. 1984). In that matter, the police arrived at suspect Willhauck's home at 3:30 a.m. to execute an arrest warrant issued in connection with an alleged high-speed police chase that occurred six months before. The suspect was never arrested because his attorney was able to convince the police supervisor that the warrant for failure to appear in court was issued in error. It was later confirmed that this assertion was correct. Willhauk's civil rights action argued that the

---

[4] It is not alleged that the named Plaintiffs in this action, whose home is the subject of the disputed entry, are members of any gang or organized crime syndicate. Defendants have argued that justification for a 4:00 a.m. entry is found, in part, upon the belief that Erik and Luis, as well as Jose, are members of the Bloods, M-13s, or Salvadorians with Pride gangs. These factual assertions by Defendants are in dispute, and therefore, do not form part of this Court's summary judgment analysis. Assuming, however, that such gang relationships exist between the aforementioned individuals and those groups, these relationships do not provide justification for the execution of arrest warrants at 4:00 a.m. at the Perez Residence for the summary and misdemeanor offenses detailed herein. The fact that supposed members of the Perez Residence are alleged to be part of a gang presents associational claims that, by themselves, cannot justify the 4:00 a.m. entry.

attempted nighttime arrest was constitutionally impermissible under the Fourth Amendment. The district court disagreed, noting that "Plaintiffs have not cited, nor has the court's research revealed, a single authority which would support the contention that nighttime arrests pursuant to a warrant are impermissible." Willhauck, 599 F. Supp. at 283. The Court further noted that "[o]n the contrary, it appears that nighttime arrests are permitted when made pursuant to a warrant; or when justified by exigent circumstances." Id. (internal citations omitted). "Therefore, the policy of the [defendant] permitting warranted nighttime arrests cannot be the basis of a claim against it." Id. This decision was later affirmed in Willhauk v. Halpin, 953 F.2d 689 (1st Cir. 1991), but the First Circuit did not directly address the issue of a night-time entry and deferred to the district court.

Similarly, in United States v. Giwa, 617 F. Supp. 2d 1086 (D. Nev. 2007), the District of Nevada noted that the nighttime execution of an arrest warrant is not limited by the language of FED. R. CRIM. P. 41(e), which requires a search warrant to expressly authorize nighttime searches. The court further opined that an appeal to Rule 41, which deals exclusively with search warrants, is "misplaced" when used to determine the propriety of an arrest warrant executed at night. See id. at 1096 n. 4. "It makes little sense to place such a limitation on the time of day when an arrest warrant may be executed." Id.

Both Willhauk and Giwa present factual circumstances justifying a nighttime entry that are substantially different from the minor offenses previously detailed in the present matter for which the bench and arrest warrants were issued. Those cases do not address facts, as found here and in Cipes, concerning law enforcement officers' execution of arrest and bench warrants

for the most minor (summary) offenses and a misdemeanor, at 4:00 a.m., without any

compelling reason for selecting that time for their actions.

### D. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223,

231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818,

102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  Qualified immunity serves the dual purpose of holding

government officials accountable when their power is exercised unreasonably and protecting

those officials from "harassment, distraction, and liability when they perform their duties

reasonably."  See id.  "Qualified immunity applies regardless of whether the government

official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of

law and fact.'"  Id. (citing Groh v. Ramirez, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d

1068 (2004) (Kennedy, J., dissenting)).

Qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it

is effectively lost if a case is erroneously permitted to go to trial."  Mitchell v. Forsyth, 472 U.S.

511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)(emphasis deleted).  The qualified immunity

doctrine serves to eliminate "insubstantial claims" prior to discovery.  Pearson, 555 U.S. at 231

(citing Anderson v. Creighton, 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

The Supreme Court has "stressed the importance of resolving immunity questions at the

earliest possible stages in litigation." Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

In Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court articulated a two-step test to determine the appropriate application of qualified immunity. A court must decide: (1) whether the facts alleged by the plaintiff violate a constitutional right; and (2) if so, whether that right was "clearly established" at the time of the alleged violation. Id. at 201. Qualified immunity attaches unless the official's conduct violated such a clearly established right. Anderson, 483 U.S. at 640. However, the Saucier procedure, which erected a rigid framework, no longer mandates that district courts decide the two prongs in any particular order. Pearson, 555 U.S. at 236. The decision is left to the discretion of the district court. Id.

An evaluation of the factual circumstances underlying the present matter, and a thorough examination by the Court of the case and statutory law relating to the nighttime execution of warrants, indicates that there is a significant lack of clarity and circuit court precedent as to the propriety of such actions by law enforcement. As noted earlier in this Opinion, the constitutional invalidity of this particular search is premised upon specific facts; however, the constitutional impropriety of the entry does not, in and of itself, require that the Court hold the Defendants liable. The legal right must be "clearly established" in order for liability to attach.

The constitutionality of the service of bench and arrest warrants is an area of widespread uncertainty and inconsistency among district courts. See Cipes, 386 F. Supp. 2d at

23

43 (D. Conn.) (holding nighttime entry unreasonable, but finding officers protected from suit by qualified immunity); see also Willhauck, 599 F. Supp. at 283 (D. Mass.) (finding 3:30 a.m. entry constitutional); Giwa, 617 F. Supp. 2d at 1096 (D. Nev.) (finding nighttime entry constitutional). No Supreme Court case, nor any appellate case within the Third Circuit, clearly establishes that bench and arrest warrants are subject to the same service limitations as search warrants. In fact, the Eastern District of Pennsylvania affirmed the constitutionality of the nighttime execution of an outstanding bench warrant without even questioning the propriety of a 1:00 a.m. entry. See Wise v. City of Philadelphia, No. 97-2651, 1998 U.S. Dist. LEXIS 12149 (E.D.Pa. July 31, 1998), at *2.

It was the understanding of all Defendants that arrest and bench warrants could be served at any time, day or night. This was the policy of the Berwick Police Department and of the Probation Department. This made it all the more reasonable for ICE agents Mullings and Christiano to rely upon the judgment of local law enforcement officers when they accompanied them to the Perez Residence to execute several non-administrative warrants. See, e.g., Fields v. J.C. Blake, 349 F. Supp. 2d 910, 921-922 (E.D. Pa. 2004)(federal officials protected by qualified immunity where they relied upon a Pennsylvania arrest warrant in removal of plaintiff from military base); see also Harsfield v. Lemacks, 50 F.3d 950, 956 (11th Cir. 1995)(officers enjoyed qualified immunity where they relied upon another officer's lead despite invalidity of warrant); Mar v. City of McKeesport, No. 05-19, 2007 WL 1556911, at *4 (W.D. Pa. May 25, 2007)("[i]t is well established that officers are entitled to rely on the information and decisions of fellow and superior officers").

The Third Circuit has held that a right is "clearly established" when the "contours of the right are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" McGreevy v. Stroup, 413 F.3d 359, 366 (3d Cir. 2005) (quoting Saucier, 533 U.S. at 202). For a right to be "clearly established," it does not require that "the very action in question has previously been held unlawful," Id. (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)); rather it means that in the context of preexisting law, "the unlawfulness of the official's conduct was reasonably and objectively apparent." McGreevey, 413 F.3d at 366 (citing Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The "salient question" is "whether the state of law [at the time of the incident] gave respondents fair warning" that their actions were contrary to the law. See Hope, 536 U.S. at 741. Such fair warning is absent here, as there is no legal precedent giving reasonably clear direction that the Defendants' actions, on the undisputed facts in this case, would violate Plaintiffs' constitutional rights.

As expressed in their moving papers, and throughout the course of discovery, all Defendants believed that they were acting in accordance with the law, and in accordance with federal, state, and municipal policy. See Cipes, 386 F. Supp. 2d at 43 (defendants entitled to qualified immunity because it cannot be concluded that "officers in defendant's position would have clearly understood from the existing law that their conduct was unlawful"). Defendants maintain that they merely sought to serve facially valid warrants that did not contain any explicit time restraints. They believed that the possible presence of gang members, coupled with observed early-morning activity at the Perez Residence, made the pre-dawn entry all the more

reasonable and safe. The Court agrees, and for these reasons, finds that the Defendants are entitled to qualified immunity. Thus, all of Plaintiffs' claims against Defendants are barred.[5]

## CONCLUSION

For the foregoing reasons, Defendants' cross-motions for summary judgment are GRANTED, and Plaintiffs' motion for summary judgment is DENIED. An appropriate Order entering judgment and directing the Clerk to close this matter will accompany this Opinion.

DATE: December 29, 2011

Robert D. Mariani
United States District Judge

---

[5] Had this Court not found Defendants to be entitled to qualified immunity, it would have nevertheless entered summary judgment in favor of Defendants on Plaintiffs' claims under 42 U.S.C. §§ 1981, 1982, 1985, and 1986, for the reasons that Plaintiffs have not adduced any evidence that Defendants intended to discriminate on basis of race, a prerequisite to a finding of liability under those sections. Likewise, Plaintiffs' assertions of conspiracies under 42 U.S.C. §§ 1985 and 1986 require evidence that the conspiracies are motivated by a racial or other class-based invidiously discriminatory animus. See Griffin v. Breckenridge, 403 U.S. 88, 91 (1971); Lake v. Arnold, 112 F.3d 682, 685 (3d Cir. 1997). Plaintiffs' assertion of 42 U.S.C. § 1982 is likewise without merit, addressing as it does, the prohibition on discrimination based on race with respect to the acquisition and conveyance of real and personal property.

## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROSA PEREZ and ELVIS PEREZ, as :
Individuals and ROSA PEREZ o/b/o :
WILLIAM PEREZ and LARRY :
PEREZ, minors :
                              :
        **Plaintiffs** :
  **v.** :    **4:07-cv-2291**
                           :    **(JUDGE MARIANI)**
**BOROUGH OF BERWICK, et al.** :
                              :
      **Defendants** :

## ORDER

**NOW**, this **29th** day of **DECEMBER, 2011, THE COURT ENTERS THE FOLLOWING ORDER:**

1. Plaintiff's Motion for Summary Judgment (Doc. 118) is **DENIED.**

2. Defendants Columbia County and Tiffany Panetta's Motion for Summary Judgment (Doc. 124) is **GRANTED.**

3. Defendants David Christiano and Kimberly Mullings's Motion for Summary Judgment (Doc. 139) is **GRANTED.**

4. Defendants Berwick Police Department, Roger Bodwalk, Borough of Berwick, Steve Levan, Troy Maneval, Greg Martin, Heather Rood, and Christopher Wilson's Motion for Summary Judgment (Doc. 142) is **GRANTED.**

5. No costs, expenses, or attorneys' fees are awarded.

6.  The Clerk of the Court is directed to enter judgment in favor of the Defendants and

to close this case.

Robert D. Mariani
United States District Judge